785 F.2d 269
 UNCOMPAHGRE VALLEY WATER USERS ASSOCIATION and Montrose
Partners, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Department of the Interior, Amicus Curiae.
Town of Norwood, Intervenor.
 No. 84-1803.
 United States Court of Appeals,
Tenth Circuit.
 March 5, 1986.
 
 W. Harrison Wellford, Wellford, Wegman, Krulwich, Gold & Hoff, Washington, D.C. (John L. Sachs with him, on brief), for petitioners.
 Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C. (William H. Satterfield, General Counsel, Jerome M. Feit, Solicitor, and Bonnie C. Cord, Atty., F.E.R.C., Washington, D.C., on brief), for respondent.
 
 
 1
 F. Henry Habicht II, Asst. Atty. Gen.; Robert L. Klarquist and Arthur E. Gowran, Attys., U.S. Dept. of Justice, Washington, D.C.; and Gary J. Fisher and Wayne M. Whitlock, U.S. Dept. of the Interior, Washington, D.C., of counsel, on brief for amicus curiae the U.S.
 
 
 2
 Mark Silversher, Atty., Telluride, Colo., on brief, for intervenor, The Town of Norwood.
 
 
 3
 Before McKAY, MOORE, Circuit Judges, and BROWN, Senior District judge.*
 
 
 4
 WESLEY E. BROWN, Senior District Judge.
 
 
 5
 This controversy emanates from three administrative orders issued by the Federal Energy Regulatory Commission ("FERC or Commission"), dismissing the applications for license filed by petitioners Uncompahgre Valley Water Users Association ("UVWUA") and Montrose Partners to develop six small-scale hydroelectric power projects along the South and the Montrose and Delta Canals of the Uncompahgre Valley Water System in Montrose County, Colorado, and barring the petitioners from reapplying for licenses for the same power projects for one year from February 2, 1984. The Commission's decision in dismissing the petitioners' applications and imposing the one-year ban on competition was based upon its finding that the petitioners had, through their collusive action with the City of Montrose in obtaining an unjustifiable competitive advantage over other applicants, misused the statutory preference for municipal development of hydroelectric power projects. Petitioners bring this direct appeal pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 825l (b). They challenge the validity of these administrative orders and seek to have them set aside upon the claims that the manner in which the Commission chose to reach its final decision failed to comply with the relevant provisions of the Administrative Procedure Act and that the Commission has exceeded its administrative authority in ordering a punitive, instead of a remedial, sanction for a violation of the municipal preference provision.[1] This appeal, however, has taken on a new posture when the Court granted the Department of the Interior's request to address the question on the commission's jurisdiction over licensing for the development of hydropower facilities at the Reclamation Project in the Uncompahgre Valley. Turning to that aspect of the appeal first, we conclude that the Act of June 22, 1938, 52 Stat. 941, authorizes the Secretary of the Interior to contract with private entities for the development and sale of surplus water power when a development of such power facilities is necessary for the irrigation purposes, or an opportunity is afforded for the development of power at this reclamation project implemented under the federal reclamation and irrigation laws at the Uncompahgre Valley Water System. We hold that such authority is vested with the Department of Interior. Accordingly, we vacate the Commission's orders and dismiss the petition for review as moot.
 
 
 6
 It is important to review briefly the history of the Uncompahgre Valley Water System and the factual background that have given rise to this appeal. The United States became involved in a comprehensive scheme in the construction and maintenance of reclamation and irrigation projects in the arid western regions of the Nation in 1902. Pursuant to the Reclamation Act of 1902, 32 Stat. 388, as amended, 43 U.S.C. Secs. 371 et seq., the Secretary of the Interior directed the development of the Uncompahgre Valley Water System ("Water System") in the Uncompahgre Valley, Colorado. The Water System, constructed from 1903 to its completion in 1909, was the first major reclamation and irrigation project implemented under "that memorable law." See Environmental Defense Fund, Inc. v. Higginson, 655 F.2d 1244, 1248 (D.C.Cir.1981, MacKinnon, J., dissenting). Its principal function is to divert the water of Gunnison River through the six-mile Gunnison Tunnel to a network of 575 miles of canals and ditches which irrigates the farms and ranches of the Uncompahgre Valley and provides water for domestic consumption in the Cities of Montrose, Olathe and Delta. Id.
 
 
 7
 From 1909 until 1932, the U.S. Bureau of Reclamation operated the Water System with one of the petitioners, UVWUA, a non-profit private irrigation enterprise organized by local farmers and businessmen under the Colorado laws. In 1932, the Secretary of the Interior, pursuant to Section 5 of the August 13, 1914 Act, 38 Stat. 687, 43 U.S.C. Sec. 499, transferred to UVWUA "the care, operation and maintenance" of the Water System; and since then, UVWUA has the sole responsibility for operating and maintaining the water supply project. In exchange for this authority, UVWUA has been required to repay the federal government for the costs of the original construction and subsequent improvements of the Water System from its revenues derived from water sales.
 
 
 8
 Because UVWUA has the complete control of the Water System in regulating the flow of water, it began in mid-1979 to explore the feasibility of developing the hydroelectric power to maximize the irrigation productions in the Valley by integrating the power generating facilities along the Water System. While the Bureau of Reclamation supported a policy on preference for hydropower developments by irrigation project operators such as UVWUA, its Project Manager for the Bureau's Upper Colorado region advised UVWUA by letter of January 23, 1981 that Interior had no interest in developing the power plants having a power generating capacity of less than 5 mega-watts. The Project Manager suggested that UVWUA should file its applications on the proposed hydropower sites in the Water System with FERC as soon as possible to establish its application priority. There were two private hydropower developers who had filed permit applications in December 1980 and January 1981, respectively, for four proposed sites along the South and M & D Canals in Montrose County. UVWUA also filed a permit application in March 1981 for these sites.
 
 
 9
 Section 7(a) of the Federal Power Act, 41 Stat. 1067, as amended, 49 Stat. 842, 16 U.S.C. Sec. 800(a), supra, favors the developments of hydroelectric power facilities by states and municipalities. It directs that the Commission shall give preference to states and municipalities in issuing preliminary permits and licenses for hydroelectric power projects when their plans are as "equally well adapted" as those of a private applicant. Id.; see also 18 C.F.R. Sec. 4.33(g)(3). To seek the competitive advantage of filing under municipal preference UVWUA obtained an agreement from the City of Montrose. Under this arrangement, the City of Montrose filed three permit applications on April 21, 1981, at the same time as UVWUA withdrew its applications that covered the same areas it had proposed to develop. In that filing, the City of Montrose agreed to name UVWUA's manager as its agent in the permit proceeding. In accordance with the statutory preference for municipal development of hydroelectric power, the Commission on October 26, 1981 issued the permits to the City of Montrose and denied the permit applications previously filed by the private applicants. Six months later, the City of Montrose filed with the Commission a request to surrender its permits. The Commission accepted the City's request on June 4, 1982. On the same day, UVWUA and Montrose Partners (a limited partnership formed under the laws of Massachusetts) filed license applications for the same sites which the City of Montrose had just given up. The Commission accepted the petitioners' license application on September 2, 1982. Approximately one year later, the Commission issued an Order on Abuse of Municipal Preference on September 21, 1983, 24 FERC p 61, 317. Noting that the timing of the City of Montrose's surrender of its permits and the subsequent filing of the petitioners' license applications was apparently the result of the concerted action by these parties, the Commission believed that the petitioners had misused the municipal preference to place themselves in an advantageous competitive position over the private applicants. The Commission ordered the petitioners to respond within 30 days to a rebuttable presumption that municipal preference has been abused "where a municipality obtains and surrenders a permit, and within 90 days of the effective date of the surrender, a non-municipality, in apparent coordination with the municipality, submits a license application for the same site." Upon a finding by the Commission that the petitioners failed to demonstrate that the filing of these six license applications was not the result of concerted action by the petitioners and the City of Montrose, the Commission ordered the petitioners' applications dismissed, commenced the one-year suspension and reopened bid competition for these six sites.[2]
 
 
 10
 Oral argument before this Court on issues presented by petitioners was scheduled on June 11, 1985. On May 6, 1985, the Director of Environmental Project Review from the Department of the Interior filed with FERC a letter claiming that under the Act of June 22, 1938, 52 Stat. 941, only the Secretary of the Interior, acting through the Bureau of Reclamation, has the authority to develop the power potential on the Uncompahgre Valley Reclamation Project. On this basis, Interior asserts that FERC does not have the statutory authority to approve permits and licenses for the proposed hydroelectric power projects to be located within the Reclamation Project and requests that all pending and future applications for such be rejected as being outside the jurisdiction of FERC.
 
 
 11
 The jurisdictional question was addressed to the Court for the first time in this appeal during oral argument. Because Interior was not a party in the administrative proceedings before FERC, the Court ordered the parties to submit supplemental briefs on the jurisdictional issue. The question then becomes whether or not the Act of June 22, 1938, 52 Stat. 941, divests FERC of the general grant of authority given by Sections 4(e) and 4(f) of the Federal Power Act of 1920 (amended 1935), 16 U.S.C. Secs. 797(e) and 797(f) over the development and sale of hydropower at the Uncompahgre Valley Reclamation Project.[3] FERC concurs with Interior's view to the extent that if the Court concludes only Interior has jurisdiction to utilize the power potential at the Uncompahgre Valley Reclamation Project, such a conclusion would moot the issues assigned by petitioners in the first instant in this appeal.
 
 
 12
 FERC argues that its jurisdiction over the development of hydroelectric projects at the Uncompahgre Valley Reclamation Project lies in the general grant of authority by Sections 4(e) and 4(f) of the Federal Power Act, 16 U.S.C. Secs. 797(e) and 797(f). Section 797(e) states in pertinent part that FERC is authorized and empowered:
 
 
 13
 To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States ..., or for the purpose of utilizing the surplus water or water power from any Government dam....
 
 
 14
 Section 797(f) provides FERC the authority:
 
 
 15
 To issue preliminary permits for the purpose of enabling applicants for a license hereunder to secure the data and to perform the acts required by section 802 of this title: Provided, however, That upon the filing of any application for a preliminary permit by any person, association, or corporation the Commission, before granting such application, shall at once give notice of such application in writing to any State and municipalities likely to be interested in or affected by such application....
 
 
 16
 On the other hand, Interior asserts that FERC's general licensing jurisdiction over hydropower development has been withdrawn by the Act of June 22, 1938, 52 Stat. 941, because it is a special, project-oriented enactment which provides the Secretary of the Interior the exclusive authority over the development and sale of hydropower available at the Uncompahgre Valley. Interior's argument is grounded on a statutory construction principle, restated by the Supreme Court in Morton v. Mancari, 417 U.S. 535, 550-551, 94 S.Ct. 2474, 2482-2483, 41 L.Ed.2d 290, 301 (1974), that "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."
 
 The 1938 Act states in pertinent part:
 
 17
 That whenever a development of power is necessary for the irrigation of lands under the Uncompahgre Valley reclamation project, Colorado, or an opportunity is afforded for the development of power under said project, the Secretary of the Interior is authorized to enter into a contract for a period not exceeding forty years for the sale and development of any surplus power. The provisions of such contract shall be such as the said Secretary may deem to be equitable: Provided, That no such contract shall be made without the approval of the Uncompahgre Valley Water Users' Association, which, prior to any development of power on said project, shall be required to contract with the United States to repay the cost thereof, on such terms and conditions and with such provisions for the disposal of the annual net power profits as the said Secretary may deem to be equitable, and with or without interest on the construction cost as the said Secretary may determine....
 
 
 18
 While it appears that there is no judicial decision on the 1938 Act and its legislative history offers little useful guidance in resolving this jurisdictional dispute, our task is made easier by the parties' concurrence in recognizing that the Act of 1938 is a Congressional enactment which covers a specific reclamation project established pursuant to the Reclamation Acts of 1902 and 1906. Indeed, the general language of the Act of June 22, 1938 is substantially similar to that of Section 5 of the amendatory Reclamation Act of April 16, 1906. Both of them authorize the Secretary of the Interior to engage in an effort to utilize the hydropower resources as an incidental activity on reclamation. The only discernible difference between these two Acts is that the 1938 Act allows the Secretary of the Interior to enter into a contract for a period up to forty years for the sale and development of the surplus power available at the Uncompahgre Valley project, while the 1906 Act provides the Secretary with the leasing authority on "any surplus power or power privilege" of not more than 10 years in any of the reclamation projects. In view of the legislative lineage of these two Acts, we agree with the FERC that it is appropriate to construe the 1938 Act consonant with the legislative intent of the 1906 Act.
 
 
 19
 As noted earlier, the primary objective of the Reclamation Act of 1902 is the reclamation of lands in 16 designated states in the great plains and far western regions of the United States through irrigation. There was no provision in the Act for the disposition of water power produced for pumping in connection with irrigation. In 1906, Congress amended the Reclamation Act to allow the Secretary of the Interior to lease surplus water power. Section 5 of the Reclamation Act of 1906, 34 Stat. 117, states:
 
 
 20
 That whenever a development of power is necessary for the irrigation of lands under any project undertaken under the said reclamation act, or an opportunity is afforded for the development of power under any such project, the Secretary of Interior is authorized to lease for a period not exceeding 10 years, giving preference to municipal purposes, any surplus power or power privilege, and the moneys derived from such leases shall be covered into the reclamation fund and be placed to the credit of the project from which such power is derived: Provided, That no lease shall be made of such surplus power or power privilege as will impair the efficiency of the irrigation project.
 
 
 21
 The language of Section 5 itself does not expressly authorize the Secretary of the Interior to undertake the construction of hydroelectric facilities in an irrigation project. The legislative history of the Act, however, demonstrates that Congress intended to confer upon the Secretary such authority in those situations where "the development of power is necessary and feasible for the pumping of water for irrigation"[4] in the implementation of the reclamation projects. See Burley Irrigation District v. Ickes, 116 F.2d 529, 530-531 (D.C.Cir.1940), cert. denied, 312 U.S. 687, 61 S.Ct. 614, 85 L.Ed. 1124 (1941).
 
 
 22
 The Federal Power Act was originally entitled the Federal Water Power Act of 1920, 41 Stat. 1063. The Act was a product of "a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so." First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143, 1158 (1945). To carry out this objective, Section 4(e) of the Act, 16 U.S.C. Sec. 797(e), empowers the FERC to issue license for "nonfederal construction and operation of water power projects on navigable waters, public lands, or reservations." Chemehuevi Tribe of Indians v. Federal Power Commission, 489 F.2d 1207, 1240 (D.C.Cir.1973), rev'd on other grounds, 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975). If comprehensive water resource management by the FERC was the central thrust of the Federal Power Act, FERC argues that its licensing authority over federally controlled water is not diluted by the Act of June 22, 1938 until the Secretary of the Interior exercises his specified authority to direct the Bureau of Reclamation either to proceed with or to contract for the development of hydroelectric projects needed for the operation of the irrigation system at the Water System. FERC believes that the Federal Power Act allows it to retain jurisdiction over the hydropower development at the Uncompahgre Valley Reclamation Project in view of the fact that the Secretary of Interior has not taken any actions since 1938 in diligently pursuing the development of the projects in question.[5]
 
 
 23
 While FERC's argument is not without persuasive force, we find nothing in the Act of June 22, 1938 or its legislative history which would require the Secretary of Interior to implement any administrative actions in order to oust FERC's claim of concurrent jurisdiction over the development of power potential at the Uncompahgre Valley Reclamation site. It is true that Congress' intention in enacting the Federal Power Act was not only to provide for a comprehensive management scheme of the Nation's waterways, but also to centralize the authority over such resources in the control of one Government agency. See Iowa Hydro-Electric Cooperative v. Federal Power Commission, supra. However encompassing the general language of the Federal Power Act may be, it is equally clear that the 1938 Act is a specially-purposed enactment which contains provisions applicable only to a specific situation. When it is read in conjunction with the Act of 1906, the 1938 Act authorizes the Secretary of the Interior to contract with private entities for the development and sale of surplus water power when a development of such power facilities is essential for irrigation purposes at the Uncompahgre Valley Water System.[6] Given the specific and circumscribed role in which the Secretary of the Interior may exercise to dispose of surplus water power, we believe that our conclusion is supported by the principle of construction that the more specific legislation covering the given subject-matter will take precedence "over the general language of the same or another statute which might otherwise prove controlling." Kepner v. United States, 195 U.S. 100, 125, 24 S.Ct. 797, 802, 49 L.Ed. 114, 123 (1904). A different conclusion in sustaining the position urged by FERC here would eviscerate the vitality of the Act of 1938, rendering it a meaningless statute. We hold that FERC does not have the licensing jurisdiction to entertain an application for the development of the hydropower facilities at the Uncompahgre Valley Reclamation Project. Such function lies within the jurisdiction of the Department of the Interior, as provided by the Act of June 22, 1938, 52 Stat. 941, when a development of such power facilities is necessary for irrigation purposes, or an opportunity is afforded for the development of power at this Reclamation Project. Our decision on this jurisdictional issue renders the petitioners' appeal moot. We vacate the FERC's orders and dismiss petitioners' appeal.
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Section 7(a) of the Federal Power Act, 41 Stat. 1067, as amended, 49 Stat. 842, 16 U.S.C. Sec. 800(a) provides: "In issuing preliminary permits hereunder or licenses where no preliminary permit has been issued and in issuing licenses to new licensees under section 808 of this title the Commission shall give preference to applications therefor by States and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region; and as between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region, if it be satisfied as to the ability of the applicant to carry out such plans."
 
 
 [2]
 FERC has received 19 applications for license or preliminary permit for the power projects when it reopened the bidding process
 
 
 [3]
 We note this is not the first time in which these two Government entities are jousting for jurisdiction over the development of power facilities. While there is no contention by any of the parties involved in this appeal as to Interior's standing to seek judicial review of FERC's orders in question, we believe that, in view of the Supreme Court's holding in U.S. ex rel. Chapman v. FPC, 345 U.S. 153, 155-156, 73 S.Ct. 609, 611-612, 97 L.Ed. 918, 925 (1953), Interior has standing to assert a claim against FERC for alleged encroachment upon the statutory authority of the Secretary of the Interior. In Chapman, the Supreme Court concluded that the Secretary of the Interior had standing to challenge a grant of license by the Federal Power Commission to a private power company in a location assertedly reserved for development of public hydroelectric projects under the jurisdiction of Interior. The Court noted that the "specific interest" of the Secretary would be adversely affected by granting of private licensee's plan inasmuch as he had the statutory duty to market public power so as to "encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." Id. at 155-156, 73 S.Ct. at 611-612
 The Town of Norwood, Colorado, which has filed five license applications with FERC after it reopened the bidding process for the projects on February 2, 1984, is granted leave to intervene for the limited purpose of responding to the position advocated by Interior. Petitioners have moved to strike the materials attached to Town of Norwood's reply brief filed December 9, 1985. A portion of these materials concerns the contracting activities undertaken by Interior in exercising its claim of jurisdiction for hydropower development on the Uncompahgre Valley Reclamation Project. The petitioners' motion to strike these materials is denied.
 
 
 [4]
 See H.R.Rep. No. 2113, 59th Cong., 1st Sess. 2 (1906). "In the development of irrigation projects it sometimes occurs that the development of power is necessary and feasible for the pumping of water for irrigation. In such cases the Secretary is authorized by section 5 of the act to lease surplus power not needed for irrigation purposes. It will also often occur in the construction of irrigation works that an opportunity will be afforded by a drop in a canal, regulation of stream flow, or otherwise, to develop power not needed in connection with the project, and it was deemed wise to authorize the Secretary to lease such power opportunities or privileges. No lease shall be for more than ten years, the proceeds to be placed to the credit of the project from which the power is derived, and no lease shall be made which will impair the efficiency of the project."
 
 
 [5]
 FERC also points out that in a series of comment letters from the Department of the Interior to FERC between 1981 and May 1985 on the applications for hydropower projects to be located in the Uncompahgre Valley Reclamation Project, the failure of Interior to question or otherwise to object FERC's jurisdiction on the development of these projects further supports the position it now urges the Court to adopt. Interior has admitted that it erred in this aspect. We specifically reject FERC's contention that these erroneous actions taken by Interior is tantamount to a waiver of its statutory jurisdiction. This is because "even consistent error is still error." Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 678 n. 5, 74 S.Ct. 794, 796 n. 5, 98 L.Ed. 1035, 1045 n. 5 (1953)
 
 
 [6]
 The legislative history of the Act of June 22, 1938 indicates that the extent of the Government's involvement in the commercial development and sale of surplus water power created as a result of Interior's reclamation and irrigation project is to execute the appropriate leases or contracts with private entities to develop the hydroelectric facilities at the Uncompahgre Valley. In the comments made by Congressman Taylor of Colorado and Congressman Rich during the floor debate on this bill in the House, Mr. Taylor stated: "Mr. Speaker, the oldest reclamation project in the United States, the first one built after the reclamation law was passed in 1902, is the Uncompahgre project in my district in Colorado. This project takes water out of the Gunnison River and runs it through a 6-mile tunnel over into the Uncompahgre Valley, where it irrigates about 75,000 acres of land. At or near the mouth of the tunnel on the west side, the Pacific slope, there is a drop of several hundred feet in the canal. A private concern offers to put up the money for and built a power plan at that place on the canal. The water users on the project have agreed to pay for the power produced by that power plant. The power will be for the use of these local people ... in Montrose, Delta Counties, Colorado. The Government does not put up a nickel in connection with this project and does not have any responsibility for it.... This is one of the instances where the Government undertakes no liability whatever.... No one outside this community will be at all responsible for this development...." Mr. Rich reiterated: "As I understand, the people who will benefit they are going to put up the money for the development for this project, and eventually the money will be paid back to them. The Government has no obligation of any kind whatever in connection with this project." Mr. Taylor replied: "The gentleman is correct, the Government incurs no obligation in this matter." See 83 Cong.Rec. 2248 (Feb. 21, 1938)